**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    3:07-cr-244-J-20MCR

JOHNNY LEE JACKSON, JR.
_____

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress (Doc. 21)

filed October 26, 2007.  The Government filed a response in opposition to the Motion on

November 9, 2007 (Doc. 31).  An evidentiary hearing was held before the undersigned

on January 15, 2008.

## I.  Evidence Presented at the Hearing

During the hearing, the Government presented the testimony of five law

enforcement officers from the Jacksonville Sheriff's Office: Detective Linda Morgan,

Detective Keith Crean, Sergeant Joel Weeks, Officer Douglas Howell and Officer

Timothy Haire.  First, Detective Morgan of the Narcotics Division of the Jacksonville

Sheriff's Office testified that beginning in June 2006, she became involved in an

investigation into a potential cocaine distribution network.  (Tr. 28:6-18).[2]  A wiretap

investigation was undertaken and on August 1, 2006, the police obtained a wiretap on

---

[1]  Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

[2]  References to the transcript of the evidentiary hearing conducted on January 15, 2008, will be "Tr. Page number : line number(s)."

the phone of an individual named Yago Del Carmen.  (Tr. 29:6-14).  During the hearing,

the Government played recordings of fifteen phone calls to show a pattern whereby Del

Carmen would receive a phone call from a male in the Miami area and then shortly

thereafter, Del Carmen would begin calling his customers in an attempt to raise money.

(Tr. 34-93).  From this pattern, Detective Morgan was able to determine that Del

Carmen obtained his supply of cocaine from the male calling from South Florida.  (Tr.

94:4-13).  On August 15, 2006, Detective Morgan obtained a wiretap for the phone

belonging to the suspected drug supplier.  (Tr. 29:21-25, 30:1).  On August 21, 2006, a

phone call between the suspected supplier and Del Carmen was intercepted which led

Detective Morgan to believe the supplier would be meeting Del Carmen at Del Carmen's

residence in Jacksonville soon.[3]  (Tr. 88-90).  Detective Morgan utilized computer

software to track the location of the phone used by the suspected supplier and

determined that on August 24, 2008, the supplier was in Jacksonville, in the area of the

apartment complex where Del Carmen and his mother resided.  (Tr. 99:2-25, 100:1-9).

Accordingly, Detective Morgan ordered some members of her team to conduct

surveillance at the apartment complex and to identify any vehicles in the parking lot.

(Tr. 104:9-11).  Detective Keith Crean drove through the parking lot and noticed two

vehicles parked in the vicinity of the apartment: a dark SUV and a blue Chysler minivan.

(Tr. 104:12-20, 161:19-25, 162:1-11).  Detective Crean noted the license plates and

after running the tags determined that the dark SUV was registered in Jacksonville and

---

[3] Del Carmen resided in an apartment rented to his mother.  (Tr. 89:3-16).

the blue minivan was a rental car.  (Tr. 105:1-25, 106:1-4).  Detective Morgan testified

that the dark SUV was eliminated because they were not expecting the supplier to be

driving a car from Jacksonville.  (Tr. 105:9-17).  She also testified that it was common

practice for drug dealers to utilize rental cars.  (106:5-13). Therefore, Detective Morgan

believed the blue minivan was the vehicle being used by the drug supplier to transport

cocaine from South Florida to Jacksonville.  (Tr. 106:14-20).

On August 28, 2006, Detective Morgan was again monitoring the calls of the

supplier and Del Carmen.  At 1:25 p.m. the supplier made a telephone call to an

unknown male in Jacksonville Florida and made statements which led Detective Morgan

to believe he would be traveling to Jacksonville that day.  (Tr. 92:15-25, 93:1-7).

Detective Morgan began tracking the location of the cell phone utilized by the supplier

and was able to determine that he was indeed traveling up I-95 from South Florida

towards Jacksonville.  (Tr. 107-113).  By 7:00 p.m. the supplier had reached

Jacksonville and at approximately 8:00 p.m., Detective Bates determined he was

traveling on J. Turner Butler Boulevard ("JTB").  (Tr. 114-116).  Earlier that evening,

Detective Morgan deployed a surveillance team to the apartment complex where the

supplier and Del Carmen had met previously.  (Tr. 118:12-24, 169:1-21).  She later

gave them the description of the blue minivan along with its license number and

informed them the vehicle was believed to be in the JTB area.  (Tr. 170:1-18, 171:5-6).

She asked the team to effectuate a traffic stop, identify the occupants and to locate the

narcotics she believed would be inside.  (Tr. 122:20-23).  Detective Morgan further

testified that she did not inform the team of the wiretap so as not to jeopardize the wiretap, which was still active.  (Tr. 121:11-25, 122:1-9).

Sergeant Joel Weeks and several other JSO officers left the apartment complex and headed toward JTB.  (Tr. 171:5-6, 172:9-15).  Sergeant Weeks was able to locate the vehicle on JTB.  (Tr. 173:9-12).  He was able to confirm the license number and within one minute, observed the vehicle make an illegal U-turn.  (Tr. 173:18-25, 174:1-19).  He then turned on his lights and effectuated a traffic stop.  (Tr. 176:16-21).  Within another minute, Officer Douglas Howell arrived on the scene and joined Sergeant Weeks at the driver's side window.  (Tr. 179:1-5).  Sergeant Weeks took the driver's license to run a check on it and Officer Howell remained with the driver.  (Tr: 179:6-18).  The driver was identified as Defendant, Johnny Jackson and he had a female passenger in the vehicle with him.  (Tr. 177:14-15, 178:12-15).

Officer Howell testified that he asked Defendant for consent to search the vehicle.  (Tr. 203:5-17).  According to Officer Howell, Defendant consented and several officers began a search of the vehicle.  (Tr. 204:24-25, 205:1).  They found nothing and approximately ten to fifteen minutes later, Officer Timothy Haire arrived with his dog, Roscoe, to perform a K-9 sniff around the vehicle.  (Tr. 205:5-17).  The dog gave a positive alert on the outside rear of the vehicle.  (Tr. 229:21-25, 230:1-2).  The officers searched the vehicle a second time and once again, were unable to locate any drugs.  (Tr. 231:17-23).  Officer Haire then brought Roscoe into the vehicle to perform a sniff.  (Tr. 232:1-4).  This time, Roscoe aggressively alerted to the right rear passenger side of the vehicle.  (Tr. 232:12-23).

After Roscoe alerted inside the vehicle, the officers suspected drugs were hidden in a secret compartment within the minivan.  As none of the officers had tools which would enable them to disassemble the paneling in the minivan, Defendant and his passenger were then removed from the scene and brought to a hotel of their choosing while the minivan was removed to another location.  (Tr. 208:8-16, 209:5-25, 210:1-5).  The next day, in an abundance of caution, Detective Morgan applied for and obtained a search warrant to search the minivan.  (Tr. 130:25, 131:1-10).  After removing a speaker in the rear passenger section, three kilos of cocaine were located.  (Tr. 135:8-25, 136:1-10).

In her affidavit to obtain the search warrant, Detective Morgan stated that Defendant did not provide consent to search the vehicle.  (Tr. 132:15-18).  During the hearing, Detective Morgan testified she mistakenly stated that consent had not been given.  She assumed that because a K-9 sniff was ordered, consent had been denied because in most situations when a K-9 unit is deployed, consent is not obtained.  (Tr. 133:1-21).  Additionally, Detective Morgan testified that she did not include information regarding the wiretap in the affidavit for the search warrant because it was a live wiretap and because she did not want information regarding it to become a public record.  (Tr. 131:12-25, 132:1-6).  In his report regarding the traffic stop on August 28, 2006, Officer Haire also indicated that consent to search the vehicle had been denied.  Officer Haire explained that he too assumed no consent had been obtained because a K-9 unit is ordinarily deployed in situations when consent is not given.  (Tr. 233:8-18).  He testified

-5-

that he was not around when Officer Howell asked for consent and that he never checked with anyone as to whether consent had been obtained.  (Tr. 233:19-25).

The passenger in the vehicle with Defendant, Demetria Taylor, also testified. She stated that no one asked for permission to search the car and that she and Defendant were on the side of the road while the searches were conducted for approximately two hours.[4]  (Tr. 240:9-12, 25; 241:1-2).  On cross examination, Ms. Taylor admitted that there was traffic on the road and that she could not hear the conversation between Defendant and the officers.  (Tr. 245:5-25, 246:1-2).

Defendant now seeks to suppress the cocaine found within the minivan.

## II.  Argument

Defendant seeks to suppress evidence seized from the minivan on the grounds that: (1) the officers effectuating the traffic stop did not have any reasonable suspicion to detain and question Defendant beyond the purpose of the traffic stop; (2) the initial search of Defendant's vehicle was improper because Defendant did not consent and if any consent were given, it was not voluntary; (3) the K-9 alert was the fruit of the poisonous tree and therefore, officers lacked probable cause to conduct the second search of the vehicle; (4) the officers improperly seized Defendant's vehicle; (5) Defendant was impermissibly detained after the first three searches while officers prepared to and did conduct the final search; and (6) the search warrant was not

---

[4] Ms. Taylor stated that she was estimating how long the entire stop took as she did not have a watch.  (Tr. 241:3-5).  The JSO officers, on the other hand, testified that the entire stop took approximately 40-45 minutes.  (Tr. 188:19-24, 209:17-21, 236:20-22).

supported by probable cause.  (Doc. 21).  Although it appeared Defendant gave up

many of these arguments at the hearing, the Court will address each of them.

**A.      The Initial Stop of Defendant's Vehicle**

Although it was not entirely clear in the original Motion, during the hearing,

counsel for Defendant clarified that he was not taking the position that the traffic stop

was somehow illegal.  Instead, counsel for Defendant explained that he believed his

client made an illegal U-turn and that he was properly stopped for such.  (Tr. 258:22-

24).  Counsel for Defendant takes the position that the traffic stop was solely for the

purpose of issuing a citation as a result of the illegal U-turn and that the multiple

searches and eventual impoundment of Defendant's car exceeded the scope of the

stop.  The Government, on the other hand, takes the position that there was probable

cause based on the wiretap and earlier surveillance to believe that the blue minivan

contained cocaine and therefore, the stop and searches were permissible.

Alternatively, the Government argues it had reasonable suspicion sufficient to effectuate

a Terry stop and Defendant gave consent to search his vehicle.  Finally, the

Government claims that at the very least, Sergeant Weeks witnessed a traffic violation

and was permitted to effectuate the traffic stop and Defendant gave consent to search

his vehicle.  The Court does not believe it is necessary to examine all of these possible

scenarios because it finds the Government has established that there existed probable

cause to stop and search Defendant's vehicle based on the information learned through

the wiretap and earlier surveillance identifying the blue minivan at the residence of Del

Carmen.

Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime.  United States v. Ross, 456 U.S. 798, 799, 102 S.Ct. 2157, 2160 (1982).  "Probable cause, in turn, exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle."  United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) (quoting, United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006)).

In the instant case, investigators knew that Yago Del Carmen was selling cocaine in Jacksonville.  As a result of the wiretap on Del Carmen's phone, investigators were able to determine that after receiving a phone call from a male in South Florida, Del Carmen began calling his customers in an attempt to raise money.  Accordingly, the investigators believed the individual calling from South Florida was the supplier.  They then obtained a wiretap for the phone being used by the suspected supplier.  After intercepting a phone call indicating the supplier would be coming to Jacksonville, Detective Morgan was able to trace the location of the phone being used by the supplier and confirmed that it was in Jacksonville, Florida and in the vicinity of Del Carmen's residence.  Detective Morgan deployed an officer to conduct surveillance and identified a rented blue minivan in the parking lot in front of Del Carmen's apartment.  Detective Morgan believed this minivan to be the vehicle used by the supplier to bring cocaine to Jacksonville.

On the day of the traffic stop, Detective Morgan knew the supplier was planning to come to Jacksonville and was able to track the location of his cell phone from South Florida to Jacksonville.  She directed Sergeant Weeks to conduct a traffic stop if officers were able to locate the same blue minivan that was observed in front of Del Carmen's apartment.  When the vehicle was identified and it was confirmed that it was indeed the same vehicle, Sergeant Weeks effectuated the traffic stop.

Based on the totality of the circumstances, the Court believes probable cause existed to stop and search the vehicle.  Although Defendant argues the officers making the traffic stop could not have had probable cause because they were not even aware of the wiretapped conversations, as the Government points out, the collective knowledge of law enforcement officers involved in an investigation can be used to determine probable cause.  Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997), cert. denied, 523 U.S. 1031, 118 S.Ct. 1323 (1998).  Here, the collective knowledge of the officers, including Detective Morgan, is sufficient to establish "a fair probability that contraband or evidence of a crime [would] be found in the vehicle" at the time of the traffic stop.  Lindsey, 482 F.3d at 1293.

Moreover, the fact that the cocaine was not located until the following day does not affect the Court's decision.  After the K-9 alert inside the vehicle, the officers had reason to believe the contraband was located in a hidden compartment within the vehicle and several officers testified they did not have proper tools to disassemble the vehicle on the side of the road.  (Tr. 194:20-25, 195:1, 206:22-25, 207:1-3, 208:11-16).  Therefore, it was reasonable for the officers to move the vehicle and search it the

following day.  Notwithstanding the fact that Detective Morgan obtained a search

warrant, the subsequent search was valid in that it was supported by the probable

cause which existed at the time of the traffic stop and developed further through the use

of the K-9 sniffs.  See United States v. Mendoza Rolon, 326 F.Supp.2d 243, 248 (D.

Puerto Rico 2004) (court finds warrantless search of vehicle conducted 24 hours after

traffic stop and after the vehicle was moved is valid when officers had probable cause to

search vehicle at time of traffic stop and had legitimate reasons to move the vehicle

such as: safety of agents conducting search, safety of public who might congregate if

search conducted in public, concern that other members of drug organization might be

in area and belief that narcotics might be in hidden compartment and therefore search

may take some time to conduct) (citing Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct.

1975, 1981-82 (1970) (Court validates the search of vehicle by law enforcement agents

after its removal to a police station because probable cause and exigent circumstances

existed immediately after the defendants were arrested, but darkness at the location of

arrest prohibited a search of the vehicle)).  Accordingly, the Court finds probable cause

supported the stop and subsequent searches of Defendant's vehicle.

**B.    Consent**

Even if the Court had not found probable cause to stop and search the vehicle,

the Court would not order the seized evidence suppressed.  As argued by the

Government, counsel for Defendant admitted during the hearing that the police made a

proper traffic stop.  (Tr. 258:22-24).  Although Defendant attempted to argue that he did

not give consent to search the vehicle, no evidence was presented to counter Officer

Howell's testimony that Defendant gave consent.  In an attempt to show that he did not give consent, Defendant pointed to the statements by Detective Morgan in her affidavit for the search warrant and Officer Haire in his report that Defendant did not give consent.  The uncontroverted testimony by Detective Morgan and Officer Haire, however, explained that neither one was present when Officer Howell asked for consent and that they just assumed no consent was obtained because K-9 units are not normally deployed in situations where consent is obtained.  (Tr. 133:1-21, 233:8-18). Additionally, while Ms. Taylor, the passenger in the vehicle, testified on direct that Defendant did not give consent, on cross examination, Ms. Taylor admitted that she could not hear the conversation between Defendant and Officer Howell .[5]  (Tr. 245:5-25, 246:1-2).  Accordingly, the Court finds Defendant did give consent for the first search of the vehicle.

In the alternative, Defendant argues that his consent was not voluntary.  "'When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.'"  U.S. v. Smith, 543 F.2d 1141, 1145 (5th Cir. 1976), cert. denied, 429 U.S. 1110, 97 S.Ct. 1147 (1977) (quoting Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792 (1968)).  "Voluntariness 'is a question of fact to be determined from the totality of all the circumstances.'"  Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct.

---

[5] In any event, the Court found Ms. Taylor's testimony not credible.  When asked why she was traveling to Jacksonville with Defendant, Ms. Taylor stated she was going to see a friend. (Tr. 243:23-25).  However, when asked who the friend was, Ms. Taylor stated she did not know.  (Tr. 244:1-4).

2041, 2048 (1973)).  In his Motion, Defendant argues his consent was not voluntary because he was not given an opportunity to decline consent and was not aware of his right to do so.  (Doc. 21, p.11).  Additionally, Defendant contends that Sergeant Weeks was in possession of Defendant's license and vehicle information throughout the searches and as such, Defendant's consent was not voluntary.  Id.

During the hearing, the Government presented the testimony of Officer Howell, who stated that he asked Defendant for permission to search the minivan.  Officer Howell testified that he used a normal tone of voice, did not unholster his weapon and made no threats. (Tr. 202:19-25, 203:1-3).  Additionally, Sergeant Weeks testified that he was standing on the side of the road with Defendant while the searches were being conducted and that Defendant never disavowed consent and appeared calm.  (Tr. 184:11-25, 185:1-5).  Defendant did not provide any testimony to the contrary nor was there any evidence that Defendant was unaware of his right to decline consent.  Moreover, the mere fact that Sergeant Weeks held Defendant's license and the vehicle registration "does not vitiate [Defendant's] consent."  United States v. Chhien, 266 F.3d 1, 7-8 (1st Cir. 2001), cert. denied, 534 U.S. 1150, 122 S.Ct. 1114 (2002) (citing United States v. Purcell, 236 F.3d 1274, 1281-82 (11th Cir. 2001) (holding consent to search voluntary despite officer's retention of operator's license and registration during traffic stop), cert. denied, 534 U.S. 830, 122 S.Ct. 73 (2001); Florida v. Bostick, 501 U.S. 429, 435-36, 111 S.Ct. 2382 (1991) (explaining that consent can be voluntary even though the detainee does not feel free to leave); and United States v. Barnett, 989 F.2d 546, 554-55 (1st Cir. 1993) (stating that custody alone does not create the kind of coercive

atmosphere that abrogates consent)).  Accordingly, based on the totality of the

circumstances, the Court finds Defendant's consent was voluntarily provided.

Thereafter, as Defendant admits, the K-9 unit gave a positive alert for the

presence of drugs thereby giving the officers probable cause for further searching of the

vehicle.[6]  United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (probable cause

exists to search an automobile without a warrant when a drug dog alerts to drugs in the

car); United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998)(probable cause

existed for a warrantless vehicle search after a drug-sniffing dog was called to the

scene and, upon deployment around the vehicle, began scratching and biting at the

car's driver-side door), cert. denied, 526 U.S. 1032, 119 S.Ct. 1281 (1999); United

States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (same), cert. denied, 510 U.S. 1129,

114 S.Ct. 1097 (1994).  Accordingly, even if there had not been probable cause to stop

and search the vehicle, as Defendant admits, there was probable cause to believe

---

[6] To the extent Defendant argues it took too long for the K-9 unit to arrive, thereby causing the stop to exceed the proper duration for a traffic stop, the Court does not agree.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325 (1983).  While there is "no hard-and-fast time limit" for a permissible Terry stop, in order to determine whether a detention is too long to be justified as an investigative stop, the Court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575 (1985).  The testimony at the hearing indicated that K-9 Officer Haire arrived at the scene approximately the same time as Officer Howell and waited approximately 10-15 minutes before conducting the sniff.  (Tr. 181:16-18, 226:22-24, 227:21-25).  The Court believes the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.  Accordingly, the detention of Defendant in order to permit the K-9 unit to perform the sniff was reasonable.

Defendant committed a traffic violation.  Thereafter, Defendant gave consent to search the vehicle and probable cause developed after the K-9 gave a positive alert.

## C.    The K-9 Sniff

In his Motion, Defendant argues that because the first search of the minivan was illegal and without consent, the subsequent K-9 sniff and positive alert were "the fruit of the poisonous tree and cannot form the basis for probable cause."  (Doc. 21, p.12).  This argument is flawed for several reasons.  First, the Court has determined there existed probable cause to search the vehicle at the time the traffic stop was effectuated.  Alternatively, the Court has also determined Defendant gave proper consent for the initial search of his car.  However, even assuming the first search was illegal, the Court does not believe it so tainted the acquisition of the evidence that it must be excluded.  "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."  Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 416 (1963).  The exclusionary rule extends to evidence obtained through the exploitation of an earlier unlawful invasion or "fruit of the poisonous tree."  Segura v. United States, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385 (1984) (citing Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268 (1939)).  Evidence will not be excluded, however, if the connection between the illegal police conduct and the discovery and seizure of the evidence is "'so attenuated as to dissipate the taint.'"  Segura, 468 U.S. at 805, 104 S.Ct. at 3385 (quoting, Nardone, 308 U.S. at 341, 60 S.Ct. at 268).  Thus, evidence will not be excluded if police discover the evidence from a source independent from the illegal conduct.  Id.

In this case, the officers did not obtain the evidence as a result of the first search. The officers located nothing in the first search. Instead, the officers had an "independent source" of probable cause to search the vehicle: the positive alert to narcotics by the canine. United States v. Moore, 329 F.3d 399, 404-05 (5th Cir. 2003) (upholding denial of motion to suppress evidence recovered from vehicle and noting that officers did not obtain evidence as a result of illegal arrest but rather through "independent source" of dog sniff); United States v. Harris, 1999 WL 133134 **2 (4th Cir. 1999) (upholding denial of motion to suppress drugs located in car after illegal seizure and holding that "canine sniff provided the requisite probable cause to obtain the search warrant and was an independent source from the illegal seizure of the vehicle."); United States v. Bosby, 675 F.2d 1174, 1181 (11th Cir. 1982) (holding that detective's illegal search of briefcase did not taint subsequent search by FBI agent pursuant to valid search warrant when search warrant was based on information provided by defendants and did not contain any information obtained through first illegal search). Accordingly, even if the Court were to find the first search of Defendant's vehicle was illegal, the evidence seized from the minivan should not be suppressed as its discovery was not the result of any illegal police activity but rather a lawful canine sniff.

**D.    Seizure of the Minivan**

Defendant argues it was improper for the officers to remove the minivan from the scene of the traffic stop and that by taking away his vehicle, the police improperly detained him. The Court agrees with Defendant that the officers "seized" his vehicle when they took him to the hotel and took the minivan to an alternate location. However,

"the Fourth Amendment only prohibits 'unreasonable searches and seizures.'" <u>United States v. Virden</u>, 488 F.3d 1317, 1321 (11th Cir. 2007) (quoting U.S. Const. Amend. IV). "Ordinarily, the seizure of personal property is *per se* unreasonable unless the seizure is pursuant to a warrant issued upon probable cause." <u>Id.</u> (emphasis in original) (citing <u>United States v. Place</u>, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641 (1983)). However, a seizure of a vehicle without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband. <u>Id.</u> at 1322 (citing <u>Watts</u>, 329 F.3d at 1285 and <u>United States v. Holloman</u>, 113 F.3d 192, 195 (11th Cir. 1997)). In the instant case, as Defendant admits, the officers had probable cause to believe the vehicle contained contraband as a result of the two K-9 sniffs resulting in positive alerts. Therefore, the Court finds the minivan was not improperly seized when it was removed to another location for further inspection.

**E.      Seizure of Defendant**

As for Defendant's argument that he was improperly detained or seized when he was taken to a hotel of his choice, the Court finds this argument without merit. First, whether Defendant was improperly seized or detained has no bearing on whether the drugs seized from the minivan should be suppressed as they were not obtained during a search incident to arrest. In any event, the Court does not believe Defendant was improperly seized when he was taken to a hotel of his choice. To be seized in violation of the Fourth Amendment, a reasonable person, in view of all the circumstances surrounding the incident must have "believed that he was not free to leave." <u>United States v. Mendenhall</u>, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877 (1980). The Supreme

Court noted examples of circumstances that might indicate a seizure, such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. (citing Terry v. Ohio, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16 (1968); Dunaway v. New York, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253 (1979); 3 W. LaFave, Search and Seizure 53-55 (1978)).  In the present case, Defendant's vehicle was properly seized and Defendant and his passenger were transported by the police to a hotel of their choice.  Ms. Taylor, the passenger, testified that after being taken to the hotel, she left and went to a Greyhound station to catch a bus.  (Tr. 242:9-14).  Clearly, Defendant and Ms. Taylor felt free to leave and likewise, so too would a reasonable person. Therefore, Defendant was not unlawfully seized in violation of the Fourth Amendment.

**F.    The Search Warrant**

Finally, Defendant argues the search warrant was not supported by probable cause.  Again, the Court finds this argument without merit.  Based on the Court's prior analysis regarding probable cause, the Government was not required to obtain a search warrant to conduct the final search of the car.  United States v. Zucco, 860 F. Supp. 363, 370 (E.D. Tex. 1994) (holding that warrantless search of vehicle after its relocation to city narcotics office did not violate the Constitution) (citing United States v. Johns, 469 U.S. 478, 484, 105 S.Ct. 881, 885 (1985) ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search.")

and <u>Michigan v. Thomas</u>, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080-81 (1982) (per curiam) ("[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized.").

However, in an abundance of caution, Detective Morgan applied for and obtained a search warrant.  (Tr. 130:25, 131:1-10).  Counsel for Defendant made much of the fact that the affidavit supporting the application for the search warrant did not mention the wiretap.  However, as Detective Morgan explained, she did not include any information about the wiretap in the affidavit because wiretap was still active and she did not want to jeopardize it.  (Tr. 131:12-25).  Additionally, Detective Morgan testified that she did not want information regarding the wiretap to become a public record.  (Tr. 132:1-6).  Instead, the affidavit referenced the positive alert by the K-9, which as previously noted, provided probable cause to believe the vehicle contained controlled substances.  As such, the search warrant was supported by probable cause.

In sum, the Court finds the stop and searches of Defendant's vehicle did not violate the Fourth Amendment.  Accordingly, after due consideration, it is

**RECOMMENDED**:

Defendant's Motion to Suppress (Doc. 21) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida this  29th  day of January, 2008.


                                        *Monte C. Richardson*
                                    MONTE C. RICHARDSON
                                UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Harvey E. Schlesinger
United States District Judge

Counsel of Record